UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| JAMES KNIGHT LYMAN,<br>   Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner,<br>Social Security Administration,<br>   Defendant. | Civil Action No. 5:14-cv-00034<br><br>**REPORT AND RECOMMENDATION**<br><br>By: Joel C. Hoppe<br>   United States Magistrate Judge |

  Plaintiff James Knight Lyman asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–422. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that remand for consideration of new and material evidence is appropriate. I therefore recommend that the presiding District Judge remand the case to the Commissioner under the sixth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

  The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983).

## II. Procedural History

Lyman filed for DIB on April 21, 2011. *See* Administrative Record ("R.") 277. He was 49 years old, *id.*, and had worked as a diesel mechanic and maintenance worker, R. 326. Lyman alleged disability beginning March 24, 2011, R. 277, because of diabetes, bipolar disorder, anger and aggression issues, memory loss, Alzheimer's disease, and trouble understanding words and some commands, R. 205. After the state agency twice denied his application, R. 161, Lyman appeared with counsel at an administrative hearing on November 20, 2012, *see* R. 174–204. He and his wife testified about his mental and physical conditions and the limitations they placed upon his daily activities. R. 180–97. In particular, Lyman testified that he was receiving treatment for tremors in his upper extremities, and that these tremors made it difficult for him to grip and hold objects. R. 187–92. A vocational expert ("VE") also testified about the nature of Lyman's past work and his ability to perform other jobs in the local and national economy. R. 197–204.

The ALJ denied Lyman's application in a written decision dated February 22, 2013. R. 161–73. The ALJ determined that the record did not establish a medically determinable impairment of Parkinson's disease. R. 163–64. He found that Lyman had severe impairments of osteoarthritis, obesity, hypertension, diabetes mellitus, affective disorder, and attention deficit disorder. R. 163. He determined that these impairments, alone or in combination, did not meet or equal a listing. R. 164–66. The ALJ next determined that Lyman had the residual functional

capacity ("RFC") to perform "light work" with some postural and environmental restrictions.[1] R. 15. Relying on the VE's testimony, the ALJ concluded that Lyman could not return to any past relevant work, but could perform other jobs, including car wash attendant, storage rental facility clerk, and routing clerk. R. 170–73. He therefore determined that Lyman was not disabled under the Act. R. 21. Lyman submitted additional evidence along with his petition to the Appeals Council. R. 5. The Appeals Council incorporated some of this evidence into the record, refused to consider the rest, and declined to review the ALJ's decision. R. 1–5. This appeal followed.

### III. Relevant Medical Evidence

*A.    Physical Conditions*

On October 11, 2010, Lyman had an X-ray taken of his left knee. R. 489. The X-ray showed mild narrowing and moderate osteoarthritis at the patellofemoral joint and medial compartment, knee joint effusion, and a well-defined lucent lesion compatible with a benign fibroxanthoma at the distal femoral metaphysis. *Id.* There was no evidence of fracture or intra-articular loose bodies. *Id.*

On March 8, 2012, Lyman went to RMH East Rockingham Health Center ("RMH") for treatment of a blood clot in his right arm. R. 497. He had developed right arm deep vein thrombosis during his recovery from an appendectomy the previous February. *Id.* Lyman's listed medical history included mild degenerative joint disease in both knees, type II diabetes mellitus, hypertension, morbid obesity, depression, and attention deficit disorder. R. 487–98. On physical

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

examination, his extremities appeared normal with no edema or ulcerations. R. 499. He was prescribed six months of medication for his blood clot and thrombosis. *Id*.

On June 21, 2012, Lyman reported to the emergency department after finding blood in his stool. R. 555. On physical examination, no blood was found and his extremities had a good range of motion and showed no edema. *Id.* He was referred to hospitalist service. *Id.* On a follow-up visit with Jason F. Perkins, D.O., at RMH on June 27, Lyman reported that the bleeding had stopped. R. 536. Dr. Perkins examined Lyman and had him continue on his current medications. R. 537–38.

On June 29, 2012, Lyman saw Glenn E. Deputy, M.D., for a follow up appointment.[2] R. 547. Dr. Deputy observed that Lyman's tremor had improved, though he occasionally blinked his eyes, and he continued to have diminished arm swing bilaterally while ambulating. *Id.* Dr. Deputy assessed Lyman with "[c]ontinued parkinsonian features with some improvement" and prescribed an increase in his medication. *Id.* Lyman returned to Dr. Deputy on October 1, 2012. R. 605. Dr. Deputy observed that his tremor had improved, as had his arm swing while ambulating. *Id.* He assessed "[c]ontinued parkinsonian features, improved." *Id.*

On October 5, 2012, Lyman had an appointment in preparation for a colonoscopy. R. 600–02. He reported that he had seen much less blood in his stool, but had "been having a lot of trouble with his knees recently." R. 601. Physical examination showed no edema in his lower extremities. *Id.* On November 8, 2012, Lyman had the colonoscopy, which found no pathological abnormality, normal colonic mucosa, and small internal hemorrhoids. R. 597–99. He was instructed to eat a high fiber diet and take plenty of fluids. R. 599.

---

[2] Though it is clear that Lyman had seen Dr. Deputy before—"James is seen for follow-up visit," R. 547—this is the first treatment note from Dr. Deputy in the record.

5

The Appeals Council incorporated three additional treatment notes concerning Lyman's physical impairments into the record. On September 18, 2012, Lyman returned to Dr. Perkins for a six-month follow-up visit concerning his blood clot. R. 623–27. He reported that overall he felt good, with the exception of pain in his knees. R. 623. The pain and swelling in his right arm had quickly resolved after beginning treatment, and Lyman had not experienced any related symptoms in the intervening six months. *Id.* Dr. Perkins concluded that he could safely remove Lyman from medication for his deep vein thrombosis. R. 625. On physical examination, Lyman had a dermatofibroma on his left knee and no edema, cyanosis, or varicosities in his extremities. *Id*. On October 29, 2012, Lyman reported to Dr. Perkins with poison ivy and was prescribed prednisone for treatment. R. 617–19. On examination, he had no edema in his extremities. R. 618.

On March 26, 2013, Lyman saw Daniel M. Chehebar, D.O., for a second opinion on his hand tremors. R. 634–42. Lyman reported tremors in both hands that worsened with activity, rigidity while walking, a tendency to hold objects very tightly, and a constant urge to move his hands, clench his fists, and blink his eyes. R. 636. On physical examination, Dr. Chehebar noted that Lyman had a blink tic, which caused him to "forcefully squeeze [his] eyes shut." R. 640. He had no hand tremor at rest, but mild tremor with sustained posture. *Id.* He had a casual gait with good arm swing, stride, and no shuffle. *Id.* His extremities showed no edema, cyanosis, or clubbing. *Id.* Dr. Chehebar thought it "extremely likely that his Depakote is at least contributing to some of his tremor, but [Lyman] and his wife [were] both adamant that the tremor was present prior to starting on Depakote." R. 634. Dr. Chehebar concluded that Lyman had "somewhat of a puzzling presentation, with features more suggestive of an essential tremor, such as action and postural tremor with the lack of any rest tremor, some features suggesting of parkinsonism,

6

including rigidity, but in addition has a history and examination of motor tics which is also suggestive of Tourette syndrome." R. 640. Dr. Chehebar assessed essential tremor, "Parkinsonism," and Tourrette's syndrome. R. 640–41. He adjusted Lyman's current Parkinson's medication and prescribed new medication he thought would help with the Tourette's or other movement disorder. R. 641.

*B.     Mental Conditions*

Lyman began seeing Michael A. Hoffman, M.D., on April 20, 2011. R. 478. He was already on medication for depression, and he reported having issues since childhood with anger, concentration, memory, and depression. *Id.* On examination, Lyman was alert and oriented with normal speech patterns and organized and logical thought process. R. 479. He had no hallucinations, delusions, or suicidal ideation, and his memory was intact. *Id.* He was cooperative and had a euthymic mood, appropriate affect, and fair judgment and insight. *Id.* Dr. Hoffman assessed a GAF score of 50, indicating fair adaptive functioning with moderate social and occupational impairment, and a Zung Depression Inventory of 64, indicating marked depression. *Id.* Dr. Hoffman diagnosed Lyman with recurrent and moderately severe major depressive disorder, attention deficit disorder, and a mood disorder. *Id.* Dr. Hoffman prescribed Depakote for mood instability, a stimulant for attention deficit disorder, and Prozac. R. 480.

Lyman returned to Dr. Hoffman on June 22, 2011. R. 481. He reported "doing worse versus better" and struggling with memory issues and tiredness. *Id.* He was still irritable, but not as explosively angry as before. *Id.* Dr. Hoffman assessed a GAF score of 60 and indicated that Lyman was "effectively functioning in occupational/educational, relationship, and social roles." *Id.* On July 19, 2011, Lyman reported "doing better" and "making some progress." R. 485. Dr.

7

Hoffman concluded that his conditions were improved under treatment and assessed a GAF score of 70. *Id.*

Lyman saw Dr. Hoffman regularly over the following three years. The ALJ considered nine additional treatment notes from Dr. Hoffman in his decision. In these notes, Lyman reported doing "a little better" once, R. 487 (August 30, 2011), "doing a little worse" once, R. 517 (April 17, 2012), and "doing fair" or "fairly well" six times, R. 574 (October 4, 2011), 523 (December 27, 2011), 521 (February 7, 2012), 519 (March 6, 2012), 562 (June 26, 2012), 560 (August 8, 2012). Dr. Hoffman once thought that Lyman's conditions had slightly worsened, R. 517, thrice thought that they had improved, R. 487, 574, 519, and five times found that they were unchanged or stable, R. 526, 523, 521, 562, 560. Dr. Hoffman assessed Lyman a GAF score of 70 once, R. 574, and a GAF score of 60 on every other visit, R. 487, 517, 519, 521, 523, 526, 560, 562. He maintained Lyman on the same medications, but at one point added, then removed, Seroquel. R. 521, 526.

In the three treatment notes that the Appeals Council made part of the record, Lyman reported "doing a little better," R. 614 (October 2, 2012), and "doing fair," R. 610 (January 8, 2013), 608 (February 19, 2013). Dr. Hoffman assessed a GAF score of 60 on all three occasions. R. 608, 610, 614.

C.   *Medical Opinions*

Dr. Perkins completed a Diabetes Mellitus Residual Functional Capacity Questionnaire on October 24, 2011. R. 590–94. He diagnosed Lyman with type II diabetes mellitus, hypertension, gastroesophageal reflux disease, hyperlipidemia, attention deficit disorder, tremor, anemia, and knee osteoarthritis. R. 590. He stated that Lyman suffered from loss of manual dexterity and had fine tremor in both hands at rest that worsened with exertion. *Id.* Dr. Perkins

8

opined that Lyman was capable of low stress jobs and that his symptoms would never interfere with the attention and concentration necessary to perform simple work tasks. R. 591. He stated that Lyman was not limited in his ability to walk; could sit for at least 6 hours and stand or walk for about 4 hours in an 8-hour work day; could rarely lift 50 pounds, but frequently lift lesser weights; and could rarely crouch, or squat, occasionally climb ladders, and frequently twist, stoop, and climb stairs. R. 591–92. He indicated that Lyman had significant limitations with reaching and handling, but referred to another functional capacity evaluation, which was not included in the record, for greater details. R. 593. He also opined that Lyman should avoid concentrated exposure to extreme temperatures, high humidity, and wetness. *Id.*

Dr. Hoffman completed a mental impairment questionnaire on December 5, 2011. R. 490–95. He diagnosed Lyman with attention deficit disorder, depression, and mood disorder. R. 490. He stated that Lyman's current GAF was 60 and his highest GAF over the past year was also 60. *Id*. Dr. Hoffman indicated throughout the questionnaire that Lyman was severely and debilitatingly limited. Evaluating the mental abilities needed to do unskilled work, Dr. Hoffman found Lyman seriously limited in two categories, unable to meet competitive standards in six categories, and without any functional ability in eight categories. R. 492. He stated that Lyman had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompression within a 12-month period. R. 494. Overall he opined that Lyman had a poor prognosis for his current problems, as he had only improved slightly with recent treatment and medication. R. 490.

State-agency examiner Dr. Luc Vinh reviewed Lyman's record on June 20, 2011. R. 211–13. He opined that Lyman could occasionally lift 50 pounds and frequently lift 25 pounds;

9

stand or walk for about 6 hours and sit for 6 hours in an 8-hour workday; and frequently crawl, crouch, kneel, and climb ramps stairs, ladders, ropes, and scaffolds. R. 212. He indicated that Lyman had no limitations in pushing or pulling, but should avoid concentrated exposure to hazards. R. 211–12. William Amos, M.D., reviewed Lyman's record for reconsideration on October 20, 2011. R. 226–28. He concurred with Dr. Vinh's assessment except that he found Lyman could only occasionally crawl or kneel. R. 227.

State-agency psychologist Bryce Phillips, Psy.D., also reviewed Lyman's record on June 20, 2011. R. 213–14. He found that Lyman had a moderately limited ability to maintain attention and concentration for extended periods, work with others, interact with the public, complete a normal work week without interruption, and accept instructions and criticism from supervisors. *Id.* Dr. Phillips concluded that Lyman would have difficulty concentrating, but would be able to concentrate for 2-hour periods in order to complete an 8-hour day. R. 214. On reconsideration, Sandra Francis, Psy.D., reviewed Lyman's record on October 20, 2011. R. 228–30. Dr. Francis concurred with Dr. Phillips's opinion except that she found that Lyman also had a moderately limited ability to understand, remember, and carry out detailed instructions. R. 229. Dr. Francis thought this limitation would not affect his ability to perform simple and routine tasks, but could cause difficulties with more complex ones. *Id.*

## IV. Discussion

On appeal, Lyman argues that the ALJ improperly found that his Parkinson's symptoms were not a severe impairment, the ALJ erred in assessing his RFC, and the Appeals Council failed to consider new and material evidence.[3] *See* Pl. Br. 14–19.

*A.     Severe Impairment*

---

[3] Lyman also raised other arguments. As I find it is necessary to remand for consideration of new evidence, I do not address them.

The ALJ determined that Lyman's "Parkinsonian-like features" did not amount to a severe impairment because physicians found that Lyman had symptoms of Parkinson's disease, but never definitively diagnosed him with Parkinson's disease. The ALJ reasoned that because social security regulations direct that "an individual's symptoms will not be found to affect [his] ability to perform basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present," R. 163, the evidence of Lyman's Parkinsonian symptoms without additional corroboration could not support finding the existence of a medically determinable impairment, R. 164. He therefore found these symptoms did not establish a severe impairment, and he did not consider them in later steps of his analysis. *Id.*

The ALJ's reasoning conflates the regulations' definition of a claimant's symptoms with their definition of medical signs. The former are a claimant's "own description of [his] physical or mental impairment" and "alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528(a). The latter are "anatomical, physiological or psychological abnormalities which can be observed, apart from [a claimant's] statements" and which "can be medically described and evaluated." *Id.* § 404.1528(b). If the only evidence of Parkinson's disease were Lyman's report of hand tremors and immobility, then the ALJ's reasoning would be correct. The record, however, contains multiple treatment notes documenting abnormalities observed by physicians during physical examinations. Dr. Perkins noted fine tremor in Lyman's hands at rest that worsened with exertion. R. 590. Dr. Deputy noted tremor in Lyman's hands, eye blinking, and diminished arm swing while walking.[4] R. 547, 605. Such physiological

---

[4] Dr. Chehebar's March 2013 treatment note documenting a blinking tic, rigidity, and hand tremor with sustained posture provides additional evidence that Lyman's Parkinsonian features were consistent and ongoing. R. 640. This record was not before the ALJ, but it was submitted to and considered by the Appeals Council. R. 5. I do not address whether this record is cumulative

11

anomalies observed during examination are medical signs under the regulations, not symptoms. The physicians used the colloquial meaning of "symptoms" as common in their profession, not the term of art "symptoms" as defined in the regulations. The ALJ should not have disregarded their findings simply because the physicians observing them labeled them as symptoms.

Furthermore, the ALJ should have concluded that these disorders constitute a severe impairment. An impairment is "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere" with an applicant's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12cv63, 2014 WL 1208048, at *7 (W.D. Va. Mar. 24, 2014) (citing *Evans*, 734 F.2d at 1014). This is not a difficult hurdle for the applicant to clear. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999); SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1999). Even without a conclusive diagnosis of Parkinson's disease, Lyman displayed rigidity when walking and tremors in his hands that worsened with exertion. While these conditions do not establish disability, it cannot be said that they would have such a minimal effect that they would not interfere with Lyman's ability to work. The ALJ's failure to credit Lyman's "Parkinsonian features" was legal error.

Courts review errors in social security cases to determine whether they could have changed the Commissioner's final decision that the claimant is not disabled. *Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Errors at step two may be harmless when the ALJ considered the effects of all of the

---

or could entitle Lyman to remand under sentence four of 28 U.S.C. § 405(g) as I find that other new evidence requires remand under sentence six of section 405(g). *See infra* Part IV.B.

12

claimant's impairments at later stages of the analysis. *See Brooks v. Astrue*, No. 5:10cv104, 2012 WL 1022309, at *11 (W.D. Va. Mar. 26, 2012).

The ALJ did not account for Lyman's Parkinsonian features when assessing his RFC, however. Despite adopting nearly all the functional limitations in Dr. Perkins's opinion, the ALJ did not include any restrictions on reaching, handling, or manipulating in his RFC. R. 166. This unexplained omission is troubling. The ALJ posed a hypothetical to the VE based upon Dr. Perkins's assessment, which included findings that Lyman had fine tremor in both hands at rest that worsened with exertion, loss of manual dexterity, and significant limitations with reaching and handling, and the VE still testified that a person with such restrictions would be able to work. R. 202–03, 590, 593.

Ultimately, I need not resolve whether the ALJ's errors on this issue were rendered harmless by the VE's testimony at step five. As related in the following section, I find that remand under sentence six of 42 U.S.C. § 405(g) is necessary for the Commissioner to consider new medical evidence, and a court's authority under sentence six is limited to remanding the case for "'additional evidence to be taken.'" *Wooding v. Comm'r of Soc. Sec.*, No. 4:10cv6, 2010 WL 4261268, at *2 (W.D. Va. Oct. 29, 2010) (quoting 42 U.S.C. § 405(g)). I therefore do not pass judgment on "the correctness of the administrative determination." *Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)).

*B.     New Evidence*

When a claimant appeals an ALJ's ruling, the Appeals Council first makes a procedural decision whether to grant or deny review. *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005). In making this decision, the Appeals Council must consider any additional evidence that is new, material, and related to the period on or before the date of the ALJ's decision.

13

*Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95 (4th Cir. 1991) (en banc) (citing 20 C.F.R. § 404.970(b)); *see also* SSR 13-3p, 2013 WL 785484, at *1 (Feb. 21, 2013). "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis*, 392 F. Supp. 2d at 750 (quoting *Wilkins,* 953 F.2d at 95–96).

Any evidence submitted to the Appeals Council that it considers becomes part of the record that the court reviews to determine whether the Commissioner's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96; *Wooding*, 2010 WL 4261268, at *6. The court conducts this review under sentence four of 42 U.S.C. § 405(g) and may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Any evidence that was not submitted to the Appeals Council, or that the Appeals Council chose not to incorporate into the record, is reviewed under sentence six of 42 U.S.C. § 405(g), which is narrower than sentence four. Sentence six allows a court to remand for the consideration of additional evidence if it is new and material, good cause exists for its late submission, and the claimant "presents the remanding court at least a general showing of the nature of the new evidence." *Owens v. Astrue*, No. 7:09cv263, 2010 WL 3743647, at *4 (W.D. Va. Sept. 22, 2010) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)). A court's authority under sentence six is limited to remanding the case for "'additional evidence to be taken,'" *Wooding*, 2010 WL 4261268, at *2, and it may not "rul[e] as to the correctness of the administrative determination." *Riley*, 88 F. Supp. 2d at 576.

A reviewing court also may not attempt to weigh the new evidence or to resolve conflicts with existing evidence. *Dunn v. Colvin,* 973 F. Supp. 2d 630, 642 (W.D. Va. 2013) (citing *Smith*

*v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Instead, it must determine whether the evidence was "material"—in other words, whether the evidence had "a reasonable possibility of changing the outcome of the case." *Id.* If the new evidence "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports," then it is conceivable that the ALJ would have reached a different result upon considering it, and the court must remand. *Id.*

Lyman submitted additional medical records to the Appeals Council dated September 18, 2012, to May 8, 2014. *See* R. 7–151, 606–44. The Appeals Council made some of these treatment notes part of the record, but rejected all notes dated after March 26, 2013, finding they did not relate to the time on or before the ALJ's February 22, 2013, decision. R. 2, 5. For the majority of the unincorporated treatment notes, the Appeals Council's assessment is correct; however, the records from April 2013 concerning Lyman's knee are new and material evidence that the Appeals Council incorrectly determined did not relate to the relevant period.

The record that was before the ALJ contained treatment notes about Lyman's knee issues. An October 11, 2010, X-ray of Lyman's left knee, taken five months before his alleged onset date, showed moderate osteoarthritis at the patellofemoral joint and medial compartment, knee joint effusion, and a benign fibroxanthoma, but no evidence of fracture. R. 489. Between Lyman's alleged onset date and the ALJ's decision, the record contains multiple references to Lyman having degenerative joint disease in both his knees, *see, e.g.*, R. 497, 590, but there are no doctor's visits devoted to knee issues. Routine physical examinations during visits for other impairments regularly found no lower extremity edema, *see, e.g.*, R. 499, 538, 555, and good range of motion, R. 555.

15

The ALJ based his RFC largely off Dr. Perkins's opinion, given on October 24, 2011. R. 166, 590–94. Dr. Perkins found that Lyman could sit for 6 hours and stand or walk for 4 hours in an 8-hour workday, rarely lift or carry 50 pounds and frequently lift or carry 20 pounds, rarely crouch or squat, and occasionally climb ladders. R. 591–92. The ALJ issued his opinion on February 22, 2013, and adopted the limitations found by Dr. Perkins sixteen months earlier. R. 166, 173.

Lyman began to complain of knee pain a year after Dr. Perkins's opinion. On October 5, 2012, in a treatment note in the record before the ALJ, Lyman reported that he had "been having a lot of trouble with his knees recently." R. 601. No imaging was taken at that time, and he did not display lower-extremity edema. *Id.* On September 18, 2012, in a note submitted to the Appeals Council and made part of the record, Lyman reported feeling great except for knee pain. R. 623. On examination, he had a dermatofibroma in his left knee. *Id.* These records alone do not call into doubt the ALJ's RFC determination. Among the records the Appeals Council received, but declined to include in the record, however, are three treatment notes that document significantly increased knee impairment and support Lyman's claims of increased pain.

On April 1, 2013, five weeks after the ALJ's decision, Lyman reported to RMH complaining of left knee pain that had been ongoing for several months. R. 8–9. He reported swelling and pain that worsened with bearing weight, when climbing stairs, and at night. R. 8. Lyman had moderate edema in his left calf. R. 9. The treating physician ordered an X-ray and MRI, both of which occurred on April 4, 2013. R. 10–13, 15. The X-ray showed tricompartmental osteoarthritis, predominantly affecting the lateral patellofemoral compartments, and slight lateral translation of the tibia. R. 15. The MRI showed a host of issues: two tears in the lateral meniscus; two tears in the medial meniscus, including a complex tear in the posterior horn

16

and an oblique undersurface tear that extended into the body of the meniscus with slight subluxation of the meniscus out of joint line; extensive high-grade cartilage loss in the medial and patellofemoral compartments with mild cartilage damage in the lateral compartment; an intraligamentous ganglion formation within the PCL; a benign-appearing fatty lesion on the distal tibia; moderate knee joint effusion; and moderate Baker's cyst.[5] R. 12. The Appeals Council rejected these three records, finding that they were "about a later time" and did "not affect the decision about whether [Lyman] was disabled beginning or before February 22, 2013." R. 7.

Evidence dated after the ALJ's decision relates back if it provides additional insight into impairments the claimant suffered while the ALJ was reviewing his case. *See Wilson v. Colvin*, No. 7:13cv113, 2014 WL 2040108, at *4 (W.D. Va. May 16, 2014) (finding that evidence met this standard when it "relate[d] to physical problems, and related subjective symptomology, which were addressed by the [ALJ] in his opinion"). Conversely, evidence is not related when it is not representative of the claimant's condition at the time of the ALJ's decision, such as when his condition has deteriorated or a new condition has developed. *See Dunn*, 973 F. Supp. 2d at 643 (citing *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008)) ("[I]f a social security claimant develops additional impairments or those impairments worsen after his first application for benefits, the proper recourse is to submit a new application.").

The April 1, 2013, treatment note and the diagnostic imaging following from it are new and material evidence that relates to the relevant period. They are the only treatment records directly addressing Lyman's knees since the October 2010 X-ray, and they document

---

[5] "A Baker's cyst is a fluid-filled cyst[,] . . . usually the result of a problem with your knee joint, such as arthritis or a cartilage tear." *Baker's Cyst: Definition*, Mayo Clinic (June 12, 2015), http://www.mayoclinic.org/diseases-conditions/bakers-cyst/basics/definition/con-20023332.

17

significantly increased pathology. Though the appointment and imaging occurred five weeks after the ALJ's decision, Lyman had knee issues throughout the period under the ALJ's review and reported that his pain was increasing several months before the ALJ's decision. There is no record of an accident, fall, or other triggering event to imply that the conditions rapidly degenerated in the five weeks after the ALJ's decision. Furthermore, many of the issues shown in the MRI, such as cysts, lesions, and especially widespread cartilage depletion, generally develop gradually. Accordingly, I find that these records relate to Lyman's condition as it existed before the ALJ's decision.

The records lend significantly more credibility to Lyman's reports of pain in September and October 2012 and call into doubt the ALJ's RFC determination grounded in the prior medical reports, especially Dr. Perkins's opinion, which described Lyman's RFC a year before his reports of increased knee pain and relied upon two year old imaging. The treatment notes and diagnostic findings from April 2013 plausibly indicate that Lyman's condition deteriorated since Dr. Perkins gave his opinion and call into doubt the ALJ's complete adoption of Dr. Perkins's limitations concerning Lyman's knees, such as standing, walking, and lifting. Thus, it is conceivable that the ALJ would have reached a different result if he had considered this evidence. Additionally, there was good cause for the late submission of these records as they were created after the ALJ's decision and Lyman supplied them at his earliest opportunity—with his appeal to the Appeals Council. For these reasons, I find that remand under sentence six of section 405(g) is appropriate. *Dunn*, 973 F. Supp. 2d at 642.

## V. Conclusion

The Commissioner failed to consider new and material evidence concerning Lyman's knee impairments. Accordingly, I recommend that the Court **GRANT** Lyman's motion for

summary judgment, ECF No. 18, **DENY** the Commissioner's motion for summary judgment, ECF No. 20, and **REMAND** this case for further proceedings under the sixth sentence of 42 U.S.C. § 405(g).[6]

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 7, 2015

Joel C. Hoppe
United States Magistrate Judge

---

[6] Pursuant to a sentence six remand, the Court shall retain jurisdiction in this matter pending the Commissioner's determination on remand and further action by either party. *See Wilson v. Colvin*, No. 7:13cv113, 2014 WL 2040108, at *5 (W. D. Va. May 16, 2014).